IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2024

# IN RE AMIYAH W. ET AL.

**Appeal from the Juvenile Court for Franklin County**
**No. 23-JV-30       Thomas C. Faris, Judge**

_____

**No. M2024-00080-COA-R3-PT**

_____

This is a termination of parental rights case. The trial court terminated Mother's parental rights to the two minor children on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to establish a suitable home; (3) substantial noncompliance with the permanency plans; (4) severe child abuse; (5) persistence of the conditions that led to the children's removal; and (6) failure to manifest an ability and willingness to assume custody. The trial court also determined that termination of Mother's parental rights is in the children's best interests. As an initial matter, Mother asserts that, having surrendered her parental rights at the outset of the hearing (she later rescinded her surrender), the trial court was required to continue the hearing under Tennessee Code Annotated section 36-1-112. We hold that Tennessee Code Annotated section 36-1-112 does not require a trial court to either continue or delay a contested termination hearing when a parent surrenders his or her parental rights before or during the hearing. We reverse the trial court's termination of Mother's parental rights on the ground of severe child abuse. We affirm the trial court's termination of Mother's parental rights on all remaining grounds and on its finding that termination of Mother's parental rights is in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed in Part; Affirmed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Grant D. Benere, Winchester, Tennessee, for the appellant, Noelle W.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I. Factual and Procedural History

The Department of Children's Services ("DCS") has been involved with this family since 2010 and has conducted some 18 investigations since that time. At the time of the events giving rise to the immediate appeal, DCS was providing services to the family, including family counseling and in-home services.

In June 2019, Appellant Noelle W. ("Mother") took her four children to the emergency room because she believed that something was crawling beneath their skin, and bugs and worms were coming out of their bodies. According to DCS, the children were not experiencing any physical discomfort; nothing was found to be crawling beneath their skin, and the children "behaved as if Mother's behavior was normal." The family was taken to the DCS office, where Mother was "hysterical" and insisted that insects were crawling beneath the children's skin. Mother was admitted to a behavioral-health hospital for ten days, where she tested positive for methamphetamine.

DCS removed the children from Mother's custody based on Mother's psychological instability, psychological harm to the children, and drug use. By order of August 8, 2019 (*nunc pro tunc* to July 31, 2019), the children were found to be dependent and neglected, and two of the children were placed in the custody of their grandmothers. The other two children, Amiyah W. (d/o/b May 2009) and Rayhna W. (d/o/b May 2016), who are the subjects of this appeal, were placed in foster care.

In September 2020, Mother gave birth to Novaah W., who is not the subject of this appeal. As discussed in detail below, in December 2020, the trial court entered an order finding that Novaah was dependent and neglected and the victim of severe child abuse due to Mother's methamphetamine use during pregnancy.

On March 9, 2023, DCS filed its original petition to terminate Mother's parental rights to both Amiyah and Rayhna (together, the "Children"). DCS filed an amended petition on October 4, 2023. As grounds, DCS averred: (1) abandonment by failure to visit; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plans; (4) severe child abuse; (5) persistence of the conditions that led to the Children's removal; and (6) failure to manifest an ability and willingness to assume custody or financial responsibility for the Children. DCS also averred that termination of Mother's parental rights was in the Children's best interests. An attorney was appointed to represent Mother, and a guardian ad litem was appointed to represent the Children.

The trial court heard the petition on August 4, 2023. As discussed below, Mother appeared at the hearing nearly two hours late and executed a surrender of her parental rights in the trial judge's chambers with her attorney present. After recessing for lunch, the trial

court stated that Mother appeared and "ch[ose] to execute the surrender with her attorney in chambers." The court stated:

> I told her that she did not have to appear for the balance of the evening if she didn't choose to. That was her choice. But we are going to proceed with the termination hearing, because there is a history in this case of showing up late or not showing up at all, and I just think that's the better way to proceed.

The court also addressed Mother's counsel and advised, "If you have anything to say that contradicts that, now would be the time to say it." Counsel replied: "No, Your Honor. That's great."

By order of December 12, 2023, the trial court terminated Mother's parental rights to the Children. The trial court found that DCS met its burden of proof as to each of the grounds asserted in its petition, *i.e.,* (1) abandonment by failure to visit; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plan; (4) severe child abuse; (5) persistence of conditions; and (6) failure to manifest an ability and willingness to personally assume custody or financial responsibility for the child. The trial court also determined that termination of Mother's parental rights was in the Children's best interests. Mother appeals.

## II. Issues

The sole issue presented by Mother is whether, under Tennessee Code Annotated section 36-1-112, the trial court erred in proceeding with the termination of parental rights hearing after Mother voluntarily surrendered her parental rights. Mother does not appeal the trial court's findings concerning either the grounds for termination of her parental rights, or its best-interest analysis. However, the Tennessee Supreme Court has held "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). Accordingly, we will review the trial court's findings on the grounds for termination of Mother's parental right and its best-interest analysis notwithstanding Mother's decision not to raise any issues concerning same.

## III. Standard of Review

We review the trial court's findings of fact *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). However, "[i]n light of the heightened burden of proof in termination proceedings . . . [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear

and convincing evidence of the elements necessary to terminate parental rights." *Id.* When the trial court has seen and heard witnesses, we give great deference to any findings that are based on the court's assessment of witness credibility. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). We will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it. *Id.* The trial court's conclusion that clear and convincing evidence supports grounds for termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524. Whether the trial court's factual findings amount to clear and convincing evidence that termination is in the child's best interest also is a question of law that we review *de novo* with no presumption of correctness. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

## IV. Tennessee Code Annotated section 36-1-112

We turn first to whether the trial court erred by proceeding with the August 2023 hearing of DCS's petition to terminate Mother's parental rights after she surrendered those rights during the hearing. This question involves interpretation and application of Tennessee Code Annotated section 36-1-112. The construction of a statute and the application of a statute to the facts of a case likewise present issues of law that we review *de novo* with no presumption of correctness. *Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 893 (Tenn. 2021) (citations omitted); *Comm'ns of Powell-Clinch v. Util. Mgmt. Review Bd.*, 427 S.W.3d 375, 381 (Tenn. Ct. App. 2013) (citation omitted).

As noted above, Mother arrived late to the hearing on the petition to terminate her parental rights and surrendered her rights in chambers in the presence of her attorney. Notwithstanding her surrender, the trial court notified Mother that it intended to proceed with the hearing, and it advised Mother that she was free to leave the court if she so chose. At the outset of the hearing, the trial court announced that: (1) Mother had surrendered her rights; (2) it intended to proceed with the trial; and (3) it had informed Mother that she was free to leave if she so chose. Mother's counsel did not move to continue or dismiss the matter and participated in the hearing without objection. Mother revoked surrender of her parental rights within the three-day statutory recission period. On appeal, Mother contends that the voluntary-surrender provisions of Tennessee Code Annotated section 36-1-112(d)(1) require that, "for procedural purposes, anytime that a surrender occurs, a parental rights termination hearing should cease and/or be rescheduled to allow for the expiration of the statutory rescission period." She argues that, under the statute, **her** pre-surrender legal status should have been restored when she rescinded the surrender. (Emphasis added).

DCS notes that Mother did not move for continuance or dismissal in the trial court and may not raise the issue for the first time on appeal. DCS further asserts that Mother's reliance on section 36-2-112 is misplaced. DCS argues that the statute requires the Children to be returned to the custody or guardianship arrangement that existed before the surrender, *i.e.*, to State custody. It further argues that the statute "does not have any bearing

- 4 -

on the status of the parent's rights aside from revoking the surrender itself." As DCS submits, "issues not raised at trial are generally considered waived on appeal." *In re Aliyah C.*, 604 S.W.3d 417, 419 (Tenn. Ct. App. 2019). Additionally, the Tennessee Rules of Appellate Procedure do not require the appellate courts to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). However, Tennessee Rules of Appellate Procedure 13(b) and 36(a) "'give appellate courts considerable discretion to consider issues that have not been properly presented in order to achieve fairness and justice.'" *In re Aliyah*, 604 S.W.3d at 19 (quoting *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W. 3d 911, 916 (Tenn. Ct. App. 2000)). Because our primary concern in a case involving the welfare of a child is the child's best interest, *see id.*, we exercise our discretion to address Mother's issue. Tenn. R. App. P. 2 ("For good cause, including the interest of expediting decision upon any matter, the . . . Court of Appeals . . . may suspend the requirements or provisions of any of these rules in a particular case.").

The question is whether section 36-2-112 requires a trial court to *sua sponte* continue a contested termination-of-parental-rights proceeding when a parent surrenders his or her rights during or before the hearing, and the revocation period has not expired. When construing a statute, the court's duty "is to ascertain and give effect to the intention and purpose of the legislature." *Id.* (citations omitted). Accordingly, we "give terms their natural and ordinary meaning in their statutory context unless the statute defines them." *Lawson v. Hawkins Cnty.*, 661 S.W.3d 54, 59 (Tenn. 2023) (citing *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012)). If "a statute uses a common-law term without defining it, we assume the enacting legislature adopted the term's common-law meaning 'unless a different sense is apparent from the context, or from the general purpose of the statute.'" *Id.* (quoting *In re Estate of Starkey*, 556 S.W.3d 811, 817 (Tenn. Ct. App. 2018) (quoting *Lively v. Am. Zinc Co. of Tenn.*, 137 Tenn. 261, 191 S.W. 975, 978 (1917))).

Section 36-1-112 provides that a person who executes a surrender of his or her parental rights may revoke that surrender within three days. Tenn. Code Ann. § 36-1-112(a)(1)(A). The statute further provides, in relevant part:

> A surrender or parental consent that is revoked shall have the effect of returning the child's legal status to that which existed before the surrender was executed, and the department, a licensed child-placing agency, or the person who or that had custody or guardianship of the child prior to the surrender pursuant to any parental status, prior court order or statutory authorization shall continue or resume custody or guardianship under that prior parental status, prior court order, or statutory authority, that had established the custodial or guardianship status of the child prior to the execution of the surrender or parental consent, unless a court of competent jurisdiction shall otherwise determine as specifically provided herein.

Tenn. Code. Ann. § 36-1-112(d)(1). Thus, as Mother and DCS acknowledge, when Mother revoked the surrender of her rights, custody of the Children remained with DCS.

The statute also specifically provides that

> the execution of a revocation of a surrender within the three-day period shall be grounds for the dismissal of any adoption petition filed during that period and, upon motion of the person who revoked the surrender, the court shall dismiss the adoption petition without prejudice.

Tenn. Code. Ann. § 36-1-112(a)(1)(F)(ii). Contrary to Mother's argument, nothing in the statute requires the court to dismiss a petition filed prior to a party's surrender of his or her rights or to continue or delay a contested termination hearing during the revocation period. Indeed, as DCS asserts, the General Assembly has instructed courts to prioritize and expedite contested termination of parental rights proceedings "over all other civil litigation other than child protective services cases[.]" Tenn. Code Ann. § 36-1-124. Additionally, effective July 1, 2023, "[t]he court may reduce the three-day revocation period to a twenty-four-hour revocation period if the birth parent is represented by an attorney who is licensed to practice law in this state." Tenn. Code Ann. § 36-1-112(g). In short, there is nothing in the statute from which we could infer that a trial court is required to *sua sponte* continue or delay a termination-of-parental-rights hearing in a contested proceeding when a parent voluntarily surrenders his or her parental rights. Although the statute allows a parent to withdraw his or her surrender of this fundamental right, the statute certainly is not intended as a delay mechanism in a contested proceeding.

In support of her argument, Mother cites *In re Serenity M.*, No. E2022-00682-COA-R3-PT, 2023 WL 2384778 (Tenn. Ct. App. Mar. 7, 2023). However, *Serenity M.* is factually distinguishable from the instant case. In *Serenity M.*, mother and father surrendered their parental rights on the day of the termination-of-parental-rights hearing. The trial court rescheduled the hearing, and the parents revoked their surrenders three days later. The court's decision to reschedule the hearing was not raised as an issue in the case, and so *Serenity M.* has no precedential value that would bear on this appeal.

Nonetheless, we note that the trial court did not terminate Mother's parental rights based on her surrender of same. Rather, the trial court's decision was based on the substantive grounds asserted by DCS and the evidence presented at the hearing. Mother had notice of the hearing, was represented by counsel throughout the proceedings, and had the opportunity to put on proof. In its final order, the trial court made findings of fact with respect to the grounds alleged in DCS's petition and assessed the Children's best interests. Mother's surrender of her parental rights was not a factor in the trial court's judgment, and Mother's right to revoke her voluntary surrender during the statutory period was not abridged. We now turn to review the grounds for termination of Mother's parental rights.

## V. Grounds for Termination of Parental Rights

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65 (2000); ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***In re Adoption of Female Child***, 896 S.W.2d 546, 547-48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); ***see also Santosky v. Kramer***, 455 U.S. 745 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d at 522-23 (footnote omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights in Tennessee. ***In re Kaliyah S.***, 455 S.W.3d 533, 541 (Tenn. 2015). The version of the statute in effect on the date the petition was filed is the applicable version. ***In re Braxton M.***, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). At that time, the statute provided, in relevant part:

(c) Termination of parental or guardianship rights must be based upon:
(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). Accordingly, the trial court is required "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[ ]" and, if so, whether termination of the parent's rights is in the child's best interest. ***In re Emarie E.***, No. E2022-01015-COA-R3-PT, 2023 WL 3619594, at *3 (Tenn. Ct. App. May 24, 2023) (quoting ***In re Donna E.W.***, No. M2013-02856-COA-R3PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014)). As noted above, although the petitioner needs to establish only one of the statutory grounds set out in section 36-1-113(g) to establish grounds, ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010), we must review the trial court's findings and conclusions as to each ground. ***In re Carrington H.***, 483 S.W.3d at 525-26. We now turn to that task.

### A. Abandonment by Failure to Visit and Failure to Provide a Suitable Home

Under Tennessee Code Annotated section 36-1-113(g)(1), abandonment, as defined by section 36-1-102, is a ground for termination of parental rights. The version of section 36-1-102(1)(A)(i) in effect when DCS filed its petition to terminate Mother's parental rights defines abandonment, in relevant part, as:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Section 36-1-102(1)(E) provides:

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period[.]

The statute also provides:

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(I).

DCS filed its petition to terminate Mother's parental rights on March 9, 2023. Accordingly, the relevant four-month period is November 8, 2022, through March 8, 2023. By agreed order of continuance entered on May 4, 2022, the trial court suspended Mother's visitation, finding that Mother had tested positive for amphetamine and methamphetamine on January 11, 2022. On May 23, 2022 (*nunc pro tunc* to March 23, 2022), the trial court entered a supplemental order finding that Mother submitted to a random drug screen on December 6, 2021, and tested positive for amphetamines and "high levels of methamphetamine, exceeding 10,000 ng/mL." The trial court affirmed suspension of

Mother's visitation.

In its December 12, 2023 final order, the trial court found that clear and convincing evidence supported termination of Mother's rights on the ground of abandonment by failure to visit. Specifically, the court held that

> Mother was told numerous times to get a nailbed drug test, but she just did not do it. When she finally filed a test result, it was not legible or clear. On January 11, 2023, she was told to get a new test, there is nothing to indicate she ever did that. She has no right to just sit on her hands and take advantage of this as not being a ground. She had an obligation to take some affirmative action, such as contacting her attorney, staying in touch with DCS, and doing her visits. She could have reinstated her visits with a clean drug screen.

Indeed,

> it is well-settled that a trial court's order requiring that a parent complete some task or meet a condition before resuming visitation does not preclude a finding of willfulness. "This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit." *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) (citing *In re Elijah B.*, E2010-00387-COA-R3-PT, 2010 WL 5549229, at *8 (Tenn. Ct. App. Dec. 29, 2010)). Furthermore, this Court has specifically opined that when a parent chooses not to cooperate with certain conditions, such as obtaining a drug and alcohol abuse assessment, that choice "in refusing to cooperate [ ] constitute[s] a willful decision" to discontinue visitation. *State Dept. of Children's Servs. v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005).

*In re Hayden L.*, No. E2018-00147-COA-R3-PT, 2018 WL 4190986, at *6 (Tenn. Ct. App. Aug. 31, 2018); *see also In re Jaylah W.*, 486 S.W.3d at 552-53 (same). Here, Mother's counsel stipulated that Mother "refus[ed] to use the key to get her visitation back by giving a drug screen as ordered by the [c]ourt," and there is no dispute that Mother had no visitation during the four-month statutory period. Accordingly, we affirm the trial court's finding of abandonment by failure to visit.

Mother's drug use also made it impossible for her to provide a suitable home for the Children. This Court has emphasized that a "suitable home" requires more than an adequate physical space. *In re A'ziya G.*, No. M2022-01282-COA-R3-PT, 2023 WL 2997968 at *8 (Tenn. Ct. App. April 19, 2023) (citing *e.g., In re Navada N.*, 498 S.W.3d

579, 595 (Tenn. Ct. App. 2016) (citations omitted)). As we have previously stated:

> A suitable home is one that is free of violence and illegal drugs. It is a home in which the children receive appropriate care and attention. Additionally, a parent's compliance with counseling and other requirements to address conditions that impact the care and safety of the child are related to the establishment of a suitable home for the child.

*Id.* (citations omitted).

At the time the Children were removed from her custody, Mother lived in an apartment in Winchester. DCS caseworker Thomas Meeks testified that Mother informed him that she was staying at her grandfather's home at one point, but when Mr. Meeks contacted Mother's grandfather, he stated that she had left three weeks earlier. Mr. Meeks further testified that, for more than a year of the custodial episode, Mother's whereabouts were unknown, and he "never could get a straight answer" with respect to Mother's home. More important is the fact that Mother has continued to use illegal drugs, and there is no evidence that she has taken any steps to address her drug addiction, which is the primary impediment here. As such, even if Mother had a physical home, her drug addiction would make that space unsafe for the Children. We affirm the trial court's finding of abandonment by failure to provide a suitable home.

### B. Substantial Noncompliance with the Permanency Plans.

Tennessee Code Annotated section 36-1-113(g)(2) provides that "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan" is a ground for the termination of parental rights. Termination on this ground requires the trial court to find that the parent was informed of the content of the plan(s) "and that the requirements of the plan are reasonable and related to remedying the conditions which necessitated foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). The trial court must make this finding "in conjunction with the determination of substantial noncompliance under [section] 36-1-113(g)(2)." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). The court must also determine that the parent's noncompliance is "substantial." *Id.* at 548. "[T]he real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Whether a parent has substantially complied with a parenting plan is a question of law, which we review *de novo* with no presumption of correctness. *Id.* at 548.

As discussed below, Mother participated in the creation of the July 16, 2019 parenting plan, and also attended the ratification hearing for same. However, Mother did not sign subsequent permanency plans dated January 2020, October 2020, or February

- 10 -

2023. On both the January 2020 and October 2020 plans, the "yes" box, indicating Mother's agreement with the plans, contains a typed "x". However, there is no such notation on the February 2023 plan. Furthermore, neither Mother nor her attorney are listed as attendees at the hearing to ratify either the January 2020 or the October 2020 plan. The February 2023 plan does include Mother's counsel's signature, indicating that he participated in the ratification hearing. However, the ratification order on the February 2023 plan was signed by the trial judge on April 26, 2023, which was after DCS filed its petition to terminate Mother's parental rights on March 9, 2023. At the August 2023 hearing on the petition, the trial court stated that the last parenting plan was entered in April 2023, and counsel for DCS stated that Mother "didn't have any 2023" plan.

From the foregoing, there is nothing to indicate that Mother had sufficient knowledge of the requirements under any parenting plan except the original plan, which was entered on July 16, 2019. That plan, which was admitted as Trial Exhibit 7, contains both Mother's and her attorney's signatures, indicating their participation in the ratification hearing. The July 2019 plan also indicates that Mother participated in the creation of the plan. As noted above, a parent must be informed of the content of the plan(s). Tenn. Code Ann. § 37-2-403(a)(2)(C). Thus, we conclude that Mother can be charged only with those requirements set out in the July 2019 plan, of which she was clearly aware. Those requirements include, *inter alia*: (1) completing an alcohol and drug assessment and complying with the recommendations thereof; (2) submitting to random drug screens and random pill counts; (3) completing a mental health intake and following all recommendations thereof; (4) obtaining safe and stable housing; (5) taking medications as prescribed; (5) providing proof of income and employment; and (6) signing releases in favor of DCS.

Concerning this ground, in its December 12, 2023 order terminating Mother's parental rights, the trial court held that

> [t]here is really not much in the way of effort [on the part of Mother]. Complete a drug and alcohol assessment: the Mother really did not do that or anything up-to-date. Submit to random drug screens; mental health intake; take medication as prescribed; safe and stable housing; not allow any criminal activity, and secure legal employment. Mother would state that she had employment, but she could not back it up with proof. The Mother never showed proof, apparently ever. Mother was also supposed to maintain a bonded relationship with the children. If they have been in 33 separate placements, the Court does not see how that is possible.

The record supports the trial court's findings. It is undisputed that Mother failed to comply with the most critical requirement of the permanency plan: that she take steps to overcome her addiction to amphetamine and methamphetamine and supply DCS with clean drug screens. Mother tested positive for amphetamine and methamphetamine in May 2020, August 2020, October 2020, and December 2021. Indeed, Mother's cousin, Ariel N.,

- 11 -

testified that Mother, who lived with Ariel N. for a time, has "been on meth nonstop, I know, for at least, I want to say three or four years." In its final order, the trial court specifically stated that it "is reasonably impressed by the testimony of Ariel N[.]" We read this as a finding that Ariel N.'s testimony was credible. This Court has often reiterated that, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

In addition to Ariel N.'s testimony, the record is replete with evidence showing how Mother's drug abuse has precluded her ability and willingness to parent these Children. Mother's drug use resulted in a suspension of her visitation in May 2022. It has precluded Mother from holding stable employment and from procuring housing. Rather than address her drug problem, Mother chose to cut off contact with DCS for a significant period during the pendency of this case. Given her positive drug tests, it is clear that Mother never curtailed her drug use and certainly never took the necessary steps to address her addiction. Having entirely failed to put forth any meaningful effort to address the most pressing underlying issue of her drug addiction, Mother failed to substantially comply with the reasonable requirements of the 2019 parenting plan. We affirm the trial court's finding that clear and convincing evidence supports termination of Mother's parental rights on the ground of substantial noncompliance with the permanency plans.

### C. Severe Child Abuse

Under Tennessee Code Annotated section 36-1-113(g)(4), a parent's rights may be terminated on the ground that:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against **any** child[.]

Tenn. Code Ann. § 36-1-113(g) (emphasis added). In relevant part, Tennessee Code Annotated section 37-1-102 defines severe child abuse to include:

> (D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring;

> (E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child; or

(F) Knowingly allowing a child to be within a structure where any of the following controlled substances are present and accessible to the child:

(i) Any Schedule I controlled substance listed in § 39-17-406;
(ii) Cocaine;
(iii) Methamphetamine; or
(iv) Fentanyl;

Tenn. Code Ann. § 37-1-102(b)(27)(D)-(F).

On January 11, 2021 *(nunc pro tunc* to December 2, 2020)*,* the trial court entered a default judgment against Mother finding that her youngest child, Novaah W., was dependent and neglected and the victim of severe child abuse because Mother tested positive for methamphetamine during pregnancy. DCS relies on *In re Collwynn J.*, No. E2020-00726-COA-R3-PT, 2002 WL 7319549 (Tenn. Ct. App. Dec. 11, 2020) for the proposition that the 2020 default judgment is *res judicata* on the question of severe child abuse.

In *In re Collwynn J.*, we noted "that a finding of severe abuse, even when made with regard to a different child in a different action, can still be *res judicata* in a later termination proceeding as to a subsequent child." 2002 WL 7319549 at *6 (citing **s***ee In re Trinity H.*, No. M2020-00440-COA-R3-PT, 2020 WL 5110312 (Tenn. Ct. App. Aug. 28, 2020)). Here, the order finding Novaah W. dependent and neglected as the victim of severe child abuse was entered by default based on Mother's failure to appear. Nonetheless, we have held that, "[a] default judgment is a judgment on the merits for the purposes of *res judicata.*" *Roberts v. Vaughn*, No. W2008-01126-COA-R3-CV, 2009 WL 1608981, at *4 (Tenn. Ct. App. June 10, 2009) (citing *Mitrano v. Houser,* 240 S.W.3d 854, 861 (Tenn. Ct. App.2007) (applying New Hampshire law)). So, the problem with the trial court's December 2, 2020 order is not that it is a default judgment, it is that the order specifically states that "[a] review hearing is scheduled for February 10, 2021 at 8:00 a.m." Having reserved Novaah W.'s dependency-and-neglect case for further hearing, the question is whether the December 2, 2020 order is final and, thus, *res judicata* on the question of severe child abuse for purposes of the termination-of-parental-rights proceeding.

It is well settled that "[a] trial court speaks through its orders." *Palmer v. Palmer*, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977). Based on the plain language that the trial court used in the dependency-and-neglect order, we can only conclude that it did not intend to finalize its decision until after further review. An order cannot technically be a final order until all matters between the parties are adjudicated. *Corder v. Corder*, 231 S.W.3d 346, 358 (Tenn. Ct. App. 2006) (finding that an order reserving an issue is not a final order and would not have a *res judicata* effect) (citing *Richardson v. Tenn. Bd. of Dentistry*, 913

- 13 -

S.W.2d 446, 459-60 (Tenn. 1995)). "A final judgment is one that resolves all the issues in the case, 'leaving nothing else for the trial court to do.'" *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003) (quoting *State ex rel. McAllister v. Goode*, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997)). Here, there was clearly more for the trial court to do based on its stated intent to review the case at a later date. The trial court's reservation of further hearing indicates its intent to revisit its rulings and leaves its initial findings inchoate insofar as these findings were "subject to revision" after further hearing. *Id*.; Tenn. R. Civ. P. 54.02. Having reserved further review, we can only conclude that the dependency-and-neglect case was still within the bosom of the trial court, and further modifications were permissible and within the trial court's discretion. *Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *22 (Tenn. Ct. App. July 14, 2011) (finding issues addressed in a non-final order "remain in the bosom of the trial court, and any rulings in the order may be modified at any time before a final order is entered.") (citing *Greer v. Greer*, No. W2009-01587-COA-R3-CV, 2010 WL 3852321, at *6 n. 7 (Tenn. Ct. App. Sept. 30, 2010)); *see also* Tenn. R. Civ. P. 54.02 ("[A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order . . . is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties."). Here, there is no indication that the trial court ever entered a final order in Novaah's dependency-and-neglect case. As such, the initial finding of severe child abuse in Novaah's case is not *res judicata* for purposes of the severe-child-abuse ground for termination of Mother's parental rights in this case. In the absence of any evidence that Mother committed severe child abuse against these Children, and in the absence of a final order finding that Mother committed severe child abuse against any other child, DCS failed to meet its burden of proof on this ground.

### D. Persistence of Conditions

The ground of persistence of conditions is found when:

(A)The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the

- 14 -

near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(3)(A).

In its 2019 dependency-and-neglect petition, DCS alleged that the Children were removed from Mother's care due to both the June 2019, emergency-room events and "past allegations of drug-exposed child, lack of supervision, environmental neglect, [and] not having stable housing or a job[.]" In its final order, the trial court found:

The children were removed from the home because of parental drug use, hallucinations, housing instability, financial instability, and lack of supervision. The conditions that led to the removal still persist as follows: environmental neglect, housing instability, financial instability, and continued parental drug use as to the Mother.

The trial court further found that there was little likelihood that these conditions would be remedied so that the Children could be returned safely to Mother's care and determined that the continuation of the parent/child relationship greatly diminished the Children's chances of being placed in a safe, stable, and permanent home.

For many of the reasons previously discussed, we conclude that Mother's ongoing drug use and the ensuing issues caused by her addiction are not in dispute. As the testimony shows, Mother has continued to test positive for methamphetamine and amphetamine throughout these proceedings. Mother has been unable to maintain employment, much less housing and transportation. Mother has been elusive throughout the custodial episode. She has failed to maintain contact with DCS or her Children and has chosen the lifestyle of a drug addict and not a mother. Despite being offered ample resources and opportunities to take steps to treat her addiction, Mother has largely refused. For example, Mother did not submit to a nail-bed drug test as ordered by the court, and she failed all other drug tests that she took. As candidly stated by her cousin, Ariel, Mother has been "on meth nonstop . . . for at least . . . three or four years[]" and probably longer at this point. As such, there is little likelihood that Mother will address, much less remedy, her drug problem at any early date. So long as Mother continues in her addiction, she will be unable to parent these Children. Accordingly, we conclude that clear and convincing evidence supports the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the Children's removal.

### E. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also terminated Mother's parental rights on the ground of failure to manifest an ability and willingness to assume custody or financial responsibility for the Children under Tennessee Code Annotated section 36-1-113(g)(14). This section provides that parental rights may be terminated if "[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child."

In its December 12, 2023 final order, the trial court found that "Mother did not do anything, really[]" that would manifest an ability or willingness to assume custody or financial responsibility. For many of the reasons discussed above, we agree. Ariel N. testified that the Children were "in and out" of Mother's custody before being removed from her care in 2019. She also testified that Mother's continued drug use "overtake[s] her choices" with respect to caring for her Children—a fact that is manifest throughout the record. Mother continues to abuse illegal drugs and has taken no steps to address her addiction. As a result of her choice to continue in her addiction, Mother has failed to effect necessary changes to allow her to provide a safe, stable, and secure home for these Children. During the pendency of this case, Mother has disappeared for long periods of time without contacting DCS or her Children. As a result, the Children have been subjected to numerous foster placements, which may account, in some part, for the behavioral issues and sleep difficulties the Children have demonstrated. From the totality of the circumstances, there is clear and convincing evidence that Mother has failed to manifest an ability and willingness to assume custody or financial responsibility for the Children.

## VI. Best Interests

Tennessee Code Annotated section 36-1-113(i)(1) contains a non-exclusive list of factors applicable to the court's best-interests analysis. The statutory factors include:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with

- 16 -

the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

\*\*\*

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

\*\*\*

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be

detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

Tenn. Code Ann. §§ 36-1-113(i)(1)(A)-(T), 36-1-113(i)(2).

The statute requires the court to consider "all relevant and child-centered factors applicable to the particular case[.]" Whether termination of parental rights is in a child's best interest must be "'viewed from the child's, rather than the parent's, perspective.'" *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]'" *Id.* (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). The court's "'focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Neveah M.*, 614 S.W.3d 659, 679 (Tenn. 2020) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Accordingly, some factors may weigh more heavily than others under the circumstances surrounding the particular child and parent. *Id.* (quotation omitted). Indeed, the trial court "may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *Id.* (citation omitted).

As noted above, we review the trial court's best-interest analysis under the standard of review applicable to mixed questions of fact and law. *In re Taylor B.W.*, 397 S.W.3d 105, 112-113 (Tenn. 2013). We will affirm the trial court's factual findings unless they are unsupported by a preponderance of the evidence. *In re Neveah M.*, 614 S.W.3d at 674 (citations omitted). Whether the court's factual findings amount to clear and convincing evidence that termination of parental rights is in the child's best interest is a question of law that we review *de novo* with no presumption of correctness. *Id.* (citations omitted).

The trial court's findings as recited in its December 12, 2023 order are supported by clear and convincing evidence. The Children have had multiple custodial placements and have not been in Mother's care since June 2019. Mother's continuing use of amphetamine and methamphetamine renders her unable to care for the Children as she cannot provide them with a stable home or basic needs. Mother's drug addiction resulted in loss of visitation in May 2022; however, the evidence shows that Mother did not exercise consistent visitation even when it was available to her. After suspension of visitation, Mother took no steps to regain same. Specifically, the trial court found that DCS made reasonable efforts to assist Mother, and Mother failed to take advantage of the opportunities available to her. Noting Ariel N.'s testimony, the trial court found that, although Mother may love the Children, her continual drug use has "ruled over her instincts."

Further, the evidence supports the trial court's finding that termination of Mother's parental rights will have a positive impact on the Children's critical need for stability and continuity of placement. Rayhna has been diagnosed with ADHD and asthma. When she entered her current foster placement, Rayhna had behavioral and sleep issues, but her foster Mother testified that she has improved significantly with counseling. The trial court determined that Rayhna has bonded with her foster parents and siblings, considers them her family, and is doing well in their care. Rayhna's foster mother testified that she and her husband wish to adopt Rayhna.

Amiyah also has been diagnosed with ADHD and has experienced multiple custodial placements. Since 2023, she has had positive visits with Ariel N., and Mr. Meeks testified that Ariel N. has filed a petition for custody of Amiyah. Ariel N. testified that her daughter and Amiyah have a good relationship, that she has enrolled Amiyah in youth and counseling programs, and that she wants to provide a home for Amiyah. Mr. Meeks testified that Ariel N.'s home is safe, clean, and suitable and would be a very good placement for Amiyah.

The Children have not lived with Mother since 2019. As discussed in detail above, despite ample time and opportunity, Mother has failed to make any adjustment to her circumstances, and she has wholly failed to address her drug addiction. Mother has no hope of achieving the stability required to parent so long as she continues to abuse drugs, and the Children deserve immediate stability. The Children's integration into their new homes is only stymied by the continuation of the parent/child relationship, and this is a primary consideration in determining a child's best interest. Tenn. Code Ann. § 36-1-113(i)(2) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."). There is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the Children's best interests.

## VII. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Mother's parental rights on the ground of severe child abuse. We affirm the trial court's termination of Mother's parental rights on the remaining grounds, and on its finding that termination of Mother's parental rights is in the Children's best interests. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed to the Appellant, Noelle W. Because Appellant is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_s/ Kenny Armstrong_
KENNY ARMSTRONG, JUDGE
